# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

JULIE A. SALAZAR,

       Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

       Defendant-Appellee.

No. 05-2005
(D.C. No. CIV-03-1235-RLP)

## ORDER
Filed October 5, 2006

Before **KELLY**, **BALDOCK**, and **MURPHY**, Circuit Judges.

Appellant's motion to publish the order and judgment filed in this matter on

August 23, 2006, is GRANTED. The published opinion is filed nunc pro tunc to

August 23, 2006, and a copy is attached.

                         Entered for the Court
                         ELISABETH A. SHUMAKER, Clerk


                         By:
                           Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

October 5, 2006

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JULIE A. SALAZAR,

        Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant-Appellee.

No. 05-2005

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-03-1235-RLP)**

Patricia Glazek, Santa Fe, New Mexico, for Plaintiff-Appellant.

Eric B. Tucker, Assistant Regional Counsel (David C. Iglesias, United States Attorney, Cynthia L. Weisman, Assistant United States Attorney, Tina M. Waddell, Regional Chief Counsel, Region VI, and Michael McGaughran, Deputy Regional Chief Counsel, with him on the brief), Office of the General Counsel, Social Security Administration, Dallas, Texas, for Defendant-Appellee.

Before **KELLY**, **BALDOCK**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Julie A. Salazar appeals from an opinion and order entered by a United States Magistrate Judge[1] that affirmed the decision of the Commissioner of Social Security (Commissioner) denying her application for Supplemental Security Income (SSI) benefits. We reverse and remand for an award of benefits.

## Background

On March 2, 2001, Ms. Salazar filed an application for SSI benefits on the basis of mental impairments. Her application was administratively denied initially and on reconsideration. She then requested and appeared with a non-attorney representative for a hearing before an administrative law judge (ALJ) on February 25, 2003.

At the time of her hearing, Ms. Salazar was thirty-five years old. She was the divorced mother of three children, none of whom lived with her, and essentially homeless. Her longest period of employment had been for about one year as an attendant at a pizza shop. The medical records at the time of Ms. Salazar's hearing contained diagnoses of borderline personality disorder, major depressive disorder, drug and alcohol addiction (DAA), and an unhealed broken left arm. There was also documentation concerning numerous suicide gestures.

---

[1] The parties consented to the jurisdiction of the magistrate judge.

In a decision dated April 14, 2003, the ALJ denied Ms. Salazar's request for benefits. Basically, he found that if she stopped using drugs and alcohol she would not be disabled. After the Appeals Council denied her request for review, she filed an action in federal district court. The magistrate judge entered an opinion and order that affirmed the Commissioner's denial of benefits. *Salazar v. Barnhart*, 344 F. Supp. 2d 723 (D.N.M. 2004). This appeal followed.

## Medical Record

The earliest medical report in the record is from January 24, 2000, when Ms. Salazar was seen by a clinical therapist at the Health Centers of Northern New Mexico (HCNNM). She told him that she had "been depressed and cutting" herself since October 1999. Aplt. App., Vol. II, at 204.

On February 20, 2000, Ms. Salazar was treated at St. Vincent Hospital on her way to jail. The emergency room physician noted that she was "at [another hospital] throughout the night after an altercation," and that she "was quite intoxicated." *Id*. at 136.

On March 1, 2000, Ms. Salazar met with Julie Walker, a psychiatrist at HCNNM. She told Dr. Walker that she was "very depressed" following several days of sobriety. *Id.* at 198. She talked about her suicide attempts and described the "compulsion" and "sense of relief" she felt when she cut herself. *Id.* Dr. Walker diagnosed her with major depressive disorder, borderline personality disorder, and polysubstance dependency.

-3-

The police brought Ms. Salazar to Espanola Hospital on March 12, 2000, after they found her running in traffic. The following day, Ms. Salazar was evaluated by a counselor from HCNNM. On the basis of the evaluation, the emergency room physician, Joe Glass, noted in his discharge summary that her suicide gestures were secondary to her DAA.

On March 16, 2000, Ms. Salazar saw Dr. Walker, who again reconfirmed her diagnoses, including borderline personality disorder. On March 20, 2000, when Ms. Salazar returned to see Dr. Walker, she told her that she "fe[lt] she [was] slipping back in to depression," and explained that she "[found] it difficult to get out of bed in [the morning]." *Id.* at 183. Ms. Salazar said that she had not been abusing alcohol or drugs recently, and Dr. Walker noted the same diagnoses.

On the evening of March 20, 2000, Ms. Salazar was taken to a detention center after she was picked up by the police on a warrant for failing to appear for a traffic violation. The next day, a police officer filled out a certification for an emergency mental health evaluation because Ms. Salazar was threatening suicide. She was visited by a counselor from HCNNM, whose mental health evaluation offered diagnoses of major depression, polysubstance abuse, and borderline personality disorder.

On April 16, 2000, the police brought Ms. Salazar to Espanola Hospital after they found her crawling down the street. Murray Ryan, an internal medicine specialist, was on duty in the emergency room. He noted her problems as

"[c]hronic severe drug and alcohol abuse," "[a]cute drug and alcohol toxicity," [and] "marked psycho social problems." *Id*. at 308. Dr. Ryan based his findings, in part, on a conversation with Ms. Salazar's father's girlfriend, who told him that Ms. Salazar was an alcoholic, did drugs, and had refused help. Dr. Ryan indicated that his plan was to "detox her, sober her up, [and] see what we can do about her drug and alcohol problems." *Id*. at 307.

The police brought Ms. Salazar to Espanola Hospital on April 27, 2000, after they found her wandering the streets. They said she was filthy, disheveled, and intoxicated. The emergency room physician, Miguel Dozier, described her as "very unfortunate . . . with borderline personality disorder who also has a strong substance abuse problem." *Id*. at 290. His discharge impression was "multiple drug abuse, danger to self, [and] borderline personality disorder." *Id.* As part of this same incident, she was admitted to the intensive care unit, where her physician, Mark Dickinson, noted that "[t]his is a 32 year old female with a long history of psychiatric problems and substance abuse. . . . She has a history of self destructive behavior and was admitted because of great risk to herself. . . . The parents say that she is always depressed." *Id*. at 287.

On May 27, 2000, Ms. Salazar was brought by the police to Espanola Hospital after she was found jumping into a river. Her feet were also injured from her attempts to brand them with a hot coat hanger. Dr. Dozier was the

emergency room physician on duty, and he again noted his impressions of polysubstance abuse and borderline personality disorder.

Ms. Salazar went to see Dr. Ryan on May 31, 2000, for a checkup following her release from the hospital. The notes in his file state that she was "doing pretty well." *Id*. at 319. At another unidentified time, Ms. Salazar was seen again by Dr. Ryan, who noted that she was "doing great," [f]antastically better." *Id.*

But on July 16, 2000, Ms. Salazar was again brought to Espanola Hospital, this time by emergency health personnel who found her outside a home wearing nothing but her underwear. She was intoxicated, had cactus spines in her thigh, and reported being sexually assaulted.

On September 6, 2000, Ms. Salazar, who was being held in jail on a contempt charge, was allowed go see Dr. Ryan. He said that she was "[l]ooking great," and he arranged for her to have her medications in jail. *Id*. at 318.

However, Ms. Salazar was again admitted to Espanola Hospital on October 26, 2000, where she was treated for multiple self-inflicted lacerations of her left arm. Her medical history listed "self-mutilation [and] alcohol." *Id*. at 249. The emergency room physician noted that she had been "depressed" and using alcohol. *Id.* Following her release from the hospital, Ms. Salazar saw Dr. Ryan on October 31, 2000. He said that she was "doing well," although she had "[s]lashed her arms again." *Id*. at 316.

Shortly after Ms. Salazar was released from two months in jail for contempt, she went to Amity (a substance abuse facility) for an evaluation. She admitted having a "difficult time with her employment obligations due to the use of alcohol and cocaine."[2] *Id*. at 147. She reported having been charged three times for disorderly conduct, twice for assault, and one occasion each for contempt and public intoxication. Ms. Salazar also described a lifetime of problems of "serious depression[,] serious anxiety or tension[,] trouble understanding, concentrating or remembering [and] trouble controlling violent behavior," *id*. at 151-52, and told Amity that she "uses alcohol or cocaine as a way of self-medicating" when she is depressed. *Id*. at 152. She expressed "an extreme need for treatment" for her psychiatric problems. *Id.* Amity referred her for a psychological evaluation.

On November 7, 2000, Ms. Salazar went to see Dr. Ryan to get the stitches in her arm removed. After speaking at length about her alcohol and drug use, he noted: "I don't know of anything else we can do. She is pretty well involved with resources and if she stays off alcohol she does pretty well." *Id*. at 315.

On December 4, 2000, Ms. Salazar went to see John Lang, a Ph.D. in psychology, for the evaluation recommended by Amity. Dr. Lang interviewed her

---

[2]     The ALJ found that Ms. Salazar reported that "the primary reason she could not maintain employment was the abuse of alcohol and cocaine." Aplt. App., Vol. II, at 30. What she actually said was that her DAA made her employment obligations more "difficult." *Id*. at 147.

and also administered a battery of tests. He noted his impression that she "appears to be trying very hard." *Id*. at 360. She was unable to complete several tests, however, because she was distracted and impatient. She reported "high levels of guilt, feelings of persecution, self-blame, loss of interest, weight loss, and suicidal ideation." *Id*. Dr. Lang diagnosed her with "Major depression, recurrent, severe with suicidal ideation[;] . . . Polysubstance dependence[;] . . . Cocaine dependence (in remission)[;] . . . and Personality disorder NOS [not otherwise specified] with symptoms of dependent and borderline." *Id*. at 361.

On December 18, 2000, an intoxicated Ms. Salazar went to Espanola Hospital for self-inflicted lacerations to her hand. The emergency room physician requested that she be seen by a counselor in jail. Ms. Salazar told the counselor that she "got depressed [and] cut [herself] to release the pain." *Id*. at 173.

Ms. Salazar's brother called the police on December 22, 2000, after she slashed her forearm. She tested positive for alcohol and cocaine when she arrived at Espanola Hospital. The emergency room physician, Robert Kilgo, noted that she was well known to the hospital secondary to alcohol abuse and self-abusive behavior secondary to her personality disorder. *Id*. at 234. Dr. Kilgo's discharge impression was "alcohol abuse and personality disorder." *Id*.

Ms. Salazar filed her application for SSI benefits on March 2, 2001, claiming mental impairments as her disability.

On March 24, 2001, Ms. Salazar was treated at Espanola Hospital for a broken left arm that resulted from her jumping from a fast-moving vehicle while she was intoxicated. X-rays showed that she had a "comminuted fracture of the proximal shaft of the ulna," which probably "extends into the articular surface of the proximal ulna." *Id*. at 225. There was also a "comminuted fracture of the proximal radius with angulation." *Id.* She went to see Dr. Ryan on April 6, 2001, about getting her broken arm fixed; his notes state that they could not help her get her arm fixed unless she had some money.

On April 23, 2001, Ms. Salazar called Dr. Ryan's office asking for a note to excuse her from a court appearance and community service because she could not work with a broken arm. The problems continued when she went to the hospital on May 12, 2001, after a fall that re-injured her broken arm. X-rays confirmed that her arm was still broken and showed a "[s]everely comminuted, angulated, and deformed fracture of the proximal left humerus and radius." *Id.* at 208.

On May 25, 2001, Ms. Salazar went to see Dr. Ryan again about her broken arm "when she perfectly well knows." *Id*. at 310. It was his impression that she "is almost using [her arm] to shield her from any judge and so on."[3] *Id.*

---

[3] The ALJ seized on this comment from Dr. Ryan about her broken arm for his finding that Ms. Salazar had a "history of 'using' her addict status as a tool to avoid legal consequences of her actions." Aplt. App., Vol. II, at 30. This mischaracterizes the comment. Dr. Ryan's comment did not suggest that she was using her "addict status" to avoid anything, a key difference in the context of the

(continued...)

Ms. Salazar missed her October 12, 2001, appointment with a physician retained by the Social Security Administration (SSA) to conduct a consultative psychiatric examination. Ms. Salazar later said that she missed the appointment because she was "out of it" and "very depressed [and] suicidal." *Id*. at 141.

For approximately forty days prior to November 29, 2001, Ms. Salazar was an inpatient at Amistad, another substance abuse facility, where she did not drink alcohol or do drugs. Nonetheless, at the conclusion of this forty-day period of abstinence, Amistad referred Ms. Salazar to St. Vincent Hospital for "increasing depression, hopelessness, and suicidal ideation." *Id*. at 332. Laboratory tests at the hospital confirmed that her toxicology was negative for drugs and alcohol. The admitting physician at St. Vincent's, Daniel Collins, noted Ms. Salazar's chief complaint as: "I'm very suicidal. I'm homeless. I have multiple stressors, and I'm depressed." *Id.* Dr. Collins diagnosed her with major depression, recurrent; polysubstance abuse, in remission, mostly alcohol and cocaine; and post traumatic stress disorder, in partial remission, but deferred any diagnosis of a personality disorder. With regard to her physical condition, Dr. Collins noted that "[s]he did break her left arm some time ago which needs probable followup with an orthopedic surgeon because it has not been set properly. She says she did not have the money to go see an orthopedic surgeon to correctly fix her broken left arm.

3(...continued)
ALJ's findings.

The left arm is now healed. She says it sometimes pops out at the elbow when she moves it around." *Id*. at 333. X-rays, however, revealed an "old chronic ulnar fracture" and a "[f]racture of the distal radius with lucency and defect which suggest more likely a subacute fracture[,] [n]onunion[,] [and] [d]istortion as well." *Id*. at 325.

On December 4, 2001, Ms. Salazar was discharged from St. Vincent Hospital after a five-day stay and receiving antipsychotic medication. The discharging physician, William Hiltz, deferred any diagnosis of a personality disorder and stated that her prognosis was "[f]airly good, particularly if [she] maintains her clean and sober status." *Id*. at 326.

Following the initial denial of her application for SSI benefits, Ms. Salazar filed for reconsideration on December 18, 2001, complaining of problems with her broken arm and adding that she was being treated for mental problems by a physician, Robert Franklin.

On July 2, 2002, the SSA's psychological reviewer declined to complete a Psychiatric Review Technique form, stating that because Ms. Salazar failed to attend the consultative psychiatric examination in October 2001, there was insufficient evidence to determine whether she had a mental disorder.

The final medical record concerns the period of January 30 through February 4, 2003, when Ms. Salazar was hospitalized at the Las Vegas Medical

Center for depression. It appears that she brought some, but not all, of the records from this hospitalization and her treatment with Dr. Franklin to the hearing.

**Five-Step Sequential Evaluation**

In determining disability, the Commissioner generally uses a five-step sequential evaluation process. *See Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988).* Here, the ALJ followed the sequential-evaluation process and found that Ms. Salazar met steps one and two. At step three, the ALJ found that she had an impairment that met one of the Commissioner's listed impairments (mood disorder under Listing § 12.04), but that this impairment was "secondary to chronic polysubstance abuse" and that "without the effects of drug and alcohol abuse, [she] would not be disabled." Aplt. App., Vol. II, at 29-30. At step four, the ALJ concluded that if she "stopped the abuse of drugs and alcohol, she would recover to a condition of only minimal limitation," and thus retained the residual functional capacity (RFC) for light exertional work and could perform her past relevant work. *Id*. at 32. Accordingly, the ALJ concluded that Ms. Salazar was not disabled.

**Standard of Review**

We review the ALJ's decision "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)* (quotation omitted). "[B]ecause our review is based on the record taken as a

-12-

whole, we will meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial," but we "neither reweigh the evidence nor substitute our discretion for that of the Commissioner." *Id.* (quotation and brackets omitted).

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* "However, a decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation and brackets omitted).

### Borderline Personality Disorder

Ms. Salazar argues, and we agree, that the ALJ misapplied the law when he failed to consider her borderline personality disorder in his disability determination. It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. *See, e.g.,* 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 416.920(a), 416.923, 416.945. Further, the failure to consider all of the impairments is reversible error. *Langley v. Barnhart*, 373 F.3d 1116, 1123-24 (10th Cir. 2004).

The Commissioner argues that the ALJ did not need to consider Ms. Salazar's borderline personality disorder because the references in the record to this condition are "minimal" and "not the result of thorough examinations."

Aplee. Br. at 10. To the contrary, the opinions of the psychiatrist, Julie Walker, and the psychologist, John Lang, both of whom diagnosed Ms. Salazar with a personality disorder, are the most thorough examinations in the record. Also, the references to this disorder are not minimal; instead, they appear repeatedly and consistently throughout the record, and include the reports from several emergency room physicians and counselors, as noted above.

Alternatively, the Commissioner asserts that the ALJ did in fact consider this impairment because he stated that he considered "all the evidence of record." *Id.* at 9. This assertion is untenable. Indeed, personality disorders are set forth separately in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P., App. I, Listing § 12.08. The ALJ never mentions this Listing in his decision.

What is particularly troublesome about the ALJ's failure to consider Ms. Salazar's borderline personality disorder is that it may account for her abuse of drugs and alcohol, as well as her suicidal conduct and self-mutilation. Borderline personality disorder is marked by at least five of the following symptoms:

> (1) [I]mpulsiveness in, inter alia, substance abuse; (2) instability of mood, interpersonal relationships and self-image; (3) sieges of depression, irritability and anxiety; (4) lack of anger control and recurrent physical fights; (5) threats of suicide and attempts at self-mutilation; (6) uncertainty about career or long-term goals; and (7) persistent feeling of boredom or emptiness.

*McGoffin v. Barnhart,* 288 F.3d 1248, 1250 n.2 (10th Cir. 2002) (citing

2 J.E. Schmidt, Attorneys' Dictionary of Medicine (LexisNexis)).

-14-

Specifically with respect to substance abuse, suicidal conduct, and self-mutilation, individuals with borderline personality disorder display:

[I]mpulsivity in at least two areas that are potentially self damaging . . . . They may gamble, spend money irresponsibly, binge eat, abuse substances, engage in unsafe sex, or drive recklessly. Individuals with Borderline Personality Disorder display recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior . . . . Completed suicide occurs in 8% – 10% of such individuals, and self-mutilative acts (e.g., cutting or burning) and suicide threats and attempts are very common.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 707. (DSM-IV.) Moreover, "[b]orderline [p]ersonality [d]isorder often co-occurs with **Mood Disorders** [such as depression], and when criteria for both are met, both may be diagnosed." *Id. at 709* (emphasis in original).

The ALJ's failure to consider Ms. Salazar's borderline personality disorder, singly and in combination with her other impairments, requires that we reverse. *Langley*, 373 F.3d at 1123-24.

### Lack of Substantial Evidence

Ms. Salazar next argues that the ALJ's determination that her DAA is a contributing factor material to her disability is not supported by substantial evidence. Again, we agree.

There are special statutes and regulations governing drug and alcohol cases. The Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110

-15-

Stat. 848, 852 (enacted March 29, 1996) added an extra step to the five-step sequential evaluation for claimants with DAA. The Act amended the Social Security Act to provide that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *see also* *McGoffin,* 288 F.3d at 1251.

The Commissioner's implementing regulations set forth the analysis to be followed by an ALJ in a case involving DAA: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(a). And 20 C.F.R. § 416.935(b) sets forth the process the Commissioner follows when there is medical evidence of drug addiction or alcoholism.

Shortly after the law was amended, the Commissioner sent out a teletype on applying the new law, which speaks to situations where a claimant has one or more other mental impairments in addition to DAA. It stresses the need for careful examination of periods of abstinence and also directs that if the effects of a claimant's mental impairments cannot be separated from the effects of substance abuse, the DAA is *not* a contributing factor material to the disability determination:

-16-

29. Q. The most complicated and difficult determinations of materiality will involve individuals with documented substance use disorders and one or more other mental impairments. In many of these instances, it will be very difficult to disentangle the restrictions and limitations imposed by the substance use disorder from those resulting from the other mental impairment(s). Can any examples be provided for how to handle the materiality determination in these situations, or can any guidance be provided for the type of information that should be used in trying to assess the impact of each impairment?

A. We know of no research data upon which to reliably predict the expected improvement in a coexisting mental impairment(s) should drug/alcohol use stop. The most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol. Of course, when evaluating this type of evidence consideration must be given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments since the last period of abstinence. When it is not possible to separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate.

Aplt. Br., Ex. A at 3-4.

With regard to the materiality finding, the Commissioner's teletype further directs that where a medical or psychological examiner cannot project what limitations would remain if the claimant stopped using drugs or alcohol, the disability examiner should find that DAA is *not* a contributing factor material to the disability determination:

27. Q. Is it appropriate for an MC/PC [medical consultant/psychological consultant] to conclude that he/she cannot project what limitations, if any, would remain if drug/alcohol use stopped and let the DE [disability examiner] make a determination that DAA is not material?

-17-

A. Yes. There will be cases in which the evidence demonstrates multiple impairments, especially cases involving multiple mental impairments, where the MC/PC cannot project what limitations would remain if the individuals stopped using drugs/alcohol. In such cases, the MC/PC should record his/her finding to that effect. Since a finding that DAA is material will be made only when the evidence establishes that the individual would not be disabled if he/she stopped using drugs/alcohol, the DE will find that DAA is not a contributing factor material to the determination of disability.

*Id*. at 2.

Although the ALJ cited the drug and alcohol regulations in his decision, he never mentioned the Commissioner's teletype. Granted, the failure to specifically mention the teletype is not fatal. What is fatal, however, is that there is not substantial evidence to support the ALJ's conclusion that Ms. Salazar would not be disabled in the absence of her DAA. Therefore, whether we view the ALJ's error as misapplication of the law or the lack of substantial evidence, the result is the same and the decision must be reversed. *See Hamlin*, 365 F.3d at 1214.

For example, the Commissioner's teletype instructs that some of the most useful evidence in DAA cases "is that relating to a period when the individual was not using drugs/alcohol," including the "length of the period of abstinence." Aplt. Br., Ex. A at 3. In Ms. Salazar's case, however, the ALJ's finding that her mental impairments improved after a period of sobriety is based on a mistaken reading of the evidence. Instead, the record establishes that on November 29, 2001, and after forty days of sobriety (the longest documented period in the record), Amistad referred Ms. Salazar to St. Vincent Hospital for inpatient psychiatric treatment for

-18-

"increasing depression, hopelessness, and suicidal ideation."  Aplt. App., Vol. II, at 332.  Ms. Salazar's Global Assessment of Functioning[4] was 35 on the day of her admission.  *Id*. at 334.

While the ALJ notes this hospitalization in his decision, he mistakenly found that "*[a]fter a period of inpatient detoxification in November and December 2001 with Dr. Collins . . .* [she] became more hopeful, less depressed, and her suicidality evaporated."  *Id*. at 30 (emphasis added).  To the contrary, Ms. Salazar was not referred to St. Vincent Hospital or Dr. Collins for detoxification; instead, after forty days of sobriety her mental problems alone were so severe that she needed to be hospitalized.  And it was after five days in a structured environment and receiving antipsychotic medication that her outlook improved.  The ALJ was wrong about this critical evidence and his finding is not supported by the evidence.

Further, the Commissioner's teletype instructs that where the record is devoid of any medical or psychological report, opinion, or projection as to the claimant's remaining limitations if she stopped using drugs or alcohol, an ALJ should "find that DAA is not a contributing factor material to the determination of

---

[4]     The Global Assessment of Functioning (GAF) is a subjective determination based on a scale of 1-100 of "the clinician's judgment of the individual's overall level of functioning."  DSM-IV at 32.  A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication . . . [or] major impairment in reality testing or communication . . . [or] major impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id*.

disability." Aplt. Br., Ex. A at 2. Setting aside the fact that the ALJ erred by failing to consider all of Ms. Salazar's medically determinable impairments, there is not substantial evidence to support his conclusion that "without the effects of drug and alcohol abuse, [she] would not be disabled" on the basis of her severe depression alone. Aplt. App, Vol. II, at 30.

Here, the ALJ apparently viewed the anecdotal comments from Dr. Ryan and the single statement from Dr. Hiltz as substantial evidence that Ms. Salazar's remaining mental limitations would not be disabling in the absence of her DAA. But we do not believe that these opinions "will bear the weight placed upon [them] by the ALJ." *McGoffin*, 288 F.3d at 1253.

In *McGoffin*, the claimant had been diagnosed with dysthymic disorder, polysubstance abuse, and borderline personality disorder. In finding that she was not disabled, the ALJ relied on the opinion of a consulting physician who examined her only once while she was living in a controlled residential treatment facility and not using any drugs or alcohol. We held that the ALJ improperly relied on the consulting physician's report because the examination occurred while the claimant was highly medicated in a structured environment, and he failed to express any opinion on her remaining limitations if she stopped using drugs and alcohol.

Comparison of our holding in *McGoffin* to the facts of this case establishes that the opinions of Drs. Ryan and Hiltz do not rise to the level of substantial evidence. In addition to the problem that Dr. Ryan's observations are at odds with

-20-

the facts and Dr. Hiltz examined Ms. Salazar in a sheltered hospital environment where she was taking antipsychotic medication, neither physician ever assessed whether Ms. Salazar's mental disorders were disabling in the absence of her DAA, and neither assessed her abilities in an independent work environment as required by the Commissioner's teletype. These opinions therefore do not rise to the level of substantial evidence. *See* *McGoffin*, 288 F.3d at 1253.

Nor are we convinced that the record supports the ALJ's finding that Ms. Salazar's suicide gestures are secondary to her DAA. This conclusion hangs on the slender thread of the discharge summary of an emergency room physician, and is directly contradicted by the other medical and psychological evidence in the record. On March 12, 2000, the police brought Ms. Salazar to Espanola Hospital. As part of her treatment, the emergency room physician, Joe Glass, requested that she be seen by a counselor in jail. The counselor noted that "[s]he appears to have poor self-awareness and poor coping skills in dealing with recurrent major depression" and that "[k]ey emotionally charged situations such as not being able to attend her son's birthday . . . seem to trigger a cycle of abuse of alcohol and drugs which lead her into suicidal gestures." Aplt. App., Vol. II, at 192. Based on the counselor's report, Dr. Glass stated in his discharge summary: "1. Alcohol and drug abuse. 2. Suicidal ideation secondary to above." *Id*. at 188. However, read closely, the counselor found that Ms. Salazar's substance abuse and resulting suicidal behavior stem from her major depression, not her DAA.

-21-

Regardless of whether Dr. Glass or the ALJ misinterpreted the counselor's comments, the ALJ's finding that Ms. Salazar's suicide attempts are secondary to her DAA cannot be sustained for another reason. The ALJ failed to explain why he ignored the opinions of Drs. Lang and Kilgo, who agreed with the counselor, and opined that her suicide attempts were secondary to either her major depressive disorder or her borderline personality disorder.[5]

The Commissioner's regulations provide that she will evaluate every medical opinion in the record, and unless she gives a treating source's opinion controlling weight, she will consider several factors in deciding the weight that should be given to any medical opinion. 20 C.F.R. § 416.927(d). In Ms. Salazar's case, the ALJ never stated who was her treating physician. Therefore, he was required to evaluate each medical opinion and accord it the proper weight on the basis of: (1) the examining relationship; (2) the treatment relationship; (3) the length of the treatment relationship and the frequency of examinations; (4) the nature and extent of the treatment relationship: (5) how well the opinion is supported; (6) its consistency with other evidence; and (7) whether the opinion is from a specialist. *Id.* at (d)(1)-(6); *see also Hamlin*, 365 F.3d at 1215.

---

[5]     This type of error extends to many other findings in the ALJ's decision. For example, from the standpoint of Ms. Salazar's mental impairments as her claimed disability, the ALJ never explains why he gave apparent controlling weight to the opinions of an internal medicine specialist, Dr. Ryan, instead of Dr. Walker, a psychiatrist, or Dr. Lang, a Ph.D. in psychology.

Here, the ALJ did not explain why he gave weight to certain medical opinions and disregarded others.  Nor did he consider the factors listed in the regulations in assessing the weight to be accorded the various opinions.

**Award of Benefits**

Ms. Salazar filed for benefits in March 2001, and more than five years have passed since she filed her application.[6]  Whether or not to award benefits is a matter of our discretion.  *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993).  Some of the relevant factors we consider are the length of time the matter has been pending, *e.g., Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 746 (10th Cir. 1993), and whether or not "given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits."  *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987).

We find it difficult to imagine that any medical or psychological professional would be able to prepare a retrospective analysis of Ms. Salazar's mental impairments in 2001, or the effect of her DAA.  This, along with the lack of evidence that she would not be disabled in the absence of her DAA, leads us to

---

[6]     At oral argument, Ms. Salazar's lawyer informed us that she had reapplied for and was receiving benefits.  Therefore, this order and judgment concerns a closed period of time, from her application date to the date she began receiving benefits.

-23-

conclude that a remand for additional fact finding and a correct application of the law would serve no useful purpose.  We therefore award benefits.[7]

We REVERSE and REMAND this case to the district court with instructions to remand to the Commissioner for an immediate award of benefits from March 2001 through the date when Ms. Salazar began receiving benefits on her reapplication.

---

[7]    Because we are reversing and remanding for an award of benefits, we do not address Ms. Salazar's arguments concerning the ALJ's failure to develop the record or to order a consultative physical examination concerning her broken left arm.