**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————————

THOMAS E. DEARDORFF,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 17-4170
(D.C. No. 2:16-CV-00397-PMW)
(D. Utah)

———————————————————————

**ORDER AND JUDGMENT**[*]

———————————————————————

Before **HOLMES**, **O'BRIEN**, and **CARSON**, Circuit Judges.

———————————————————————

Thomas E. Deardorff applied for Social Security disability benefits. The

Commissioner of the Social Security Administration denied his application, and the

district court affirmed that decision. Mr. Deardorff now appeals. Exercising

jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we reverse and remand

for further proceedings.

———————

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

I. Background

Mr. Deardorff served for sixteen years in the military. After suffering a neck injury while serving in combat in Iraq, he was medically retired from the military. The Veteran's Administration (VA) has given him a 100% disability rating.

In December 2014, he applied for a period of disability and disability insurance benefits, alleging disability beginning October 25, 2013. The claim was denied initially and on reconsideration. Mr. Deardorff then requested and received a hearing before an Administrative Law Judge (ALJ). The ALJ concluded Mr. Deardorff was not disabled after determining at step four of the sequential analysis[1] that he was capable of performing his past relevant work as a security guard. Mr. Deardorff appealed and the district court affirmed the Commissioner's decision.

II. Discussion

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wells v. Colvin*, 727 F.3d 1061, 1067 (10th Cir. 2013) (internal quotation marks omitted). Mr. Deardorff raises four issues on appeal. We conclude the first two issues involve reversible error and require remand. We do not

---

[1] "[A]n ALJ is required to assess whether or not the claimant is disabled in a five-step, sequential analysis." *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004). At step four, the ALJ considers whether "[an] impairment prevents the claimant from performing his or her past work." *Id*.

2

reach the third and fourth issues because they may be impacted by the ALJ's consideration of the first two issues on remand.

A.

In his decision, the ALJ stated "there was no evidence of record regarding most of the conditions listed [in the VA disability rating], including knee disorder and migraines." Aplt. App. at 48. Mr. Deardorff argues the ALJ's conclusion "that . . . there is no evidence of Mr. Deardorff's migraines is plainly incorrect. This resulted in the ALJ's failure to fully and completely assess Mr. Deardorff's Residual Functional Capacity (RFC) and is reversible error." Aplt. Br. at 31. We agree.

The ALJ found at step two of the sequential process Mr. Deardorff had the following severe impairments: "degenerative disc disease of the cervical spine; obesity; depression; and post-traumatic stress disorder." Aplt. App. at 44. The ALJ also noted Mr. Deardorff's records indicated he likely had carpal tunnel syndrome and thoracic spine spondylosis, but the ALJ found these impairments were not severe.

An ALJ must "consider all of the claimant's medically determinable impairments, singly and in combination." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). And "the failure to consider all impairments is reversible error." *See id*. The ALJ did not mention or make any findings as to whether Mr. Deardorff's headaches were a severe impairment at step two. But because he found at least one severe impairment, that error is harmless. *See Allman v. Colvin*, 813 F.3d 1326 (10th Cir. 2016) ("[T]he failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is

3

severe."). But, at step four, the ALJ "must consider the limiting effects of non-severe impairments in determining the claimant's RFC." *Id*. The ALJ never mentioned, let alone considered the effects of, migraines or headaches at step four in determining Mr. Deardorff's RFC.

In fact, the ALJ mentions migraines in his decision only in one paragraph. He notes the VA's disability rating was based on a number of conditions, including migraines, and then he goes on to state there is no evidence of record regarding migraines. *See* Aplt. App. at 48. Contrary to this statement, however, there is evidence in the record about Mr. Deardorff's migraines, as well as his suffering from severe headaches.

i. <u>Evidence of Migraines and Headaches</u>

At his hearing before the ALJ, Mr. Deardorff was asked about the medication he was taking and, in listing his medications, he testified that he took tizanidine to "help stop headaches." *Id*. at 93. His attorney later restated, "you're taking medication for migraines," and Mr. Deardorff replied, "Yes, sir." *Id*. at 104. His attorney asked him to describe the migraines and how often they occur and Mr. Deardorff responded: "I have them for days on end and once one's gone, it comes back in a couple of days. So they're just non-stop." *Id*. His attorney then asked: "Are you able to read or concentrate or how does it affect—how do the migraines affect you?" And he replied, "you get used to it. You try to do the best you can with it. If you don't want to hear something or you don't want to listen to something, you just don't. If you don't want to read it, don't read it. If your head

4

hurts too bad, don't read it." *Id.* Then his attorney asked, "Does that happen a lot where [your] head hurts too bad that you can't read?" He answered yes, and said that it happened "on a daily basis . . . [a]bout three to four times a week." *Id.* He also testified later that he had difficulties with driving because it hurt to turn his head both directions. He said: "If I turn it too far, instant headache. Almost a blinding headache." *Id.* at 113. In summarizing Mr. Deardorff's hearing testimony, the ALJ never mentioned this testimony. *See id.* at 47.

In addition, the record contains medical-record evidence of Mr. Deardorff's history of migraines dating back to the summer of 2009. In July 2009, he complained to his medical provider of "headaches, visual disturbances with associated nausea, photophobia and intolerance to sound." *Id.* at 1254. A few weeks later, in August 2009, he went to the doctor and presented "with [headache] symptoms for the past 4-5 days. Started in the right posterior and radiates around to behind the left eye. Has had photophobia and nausea. History of migraines. Currently on Topamax." *Id.* The provider notes conclude: "Patient with headache consistent with migraine" and state "Continue with the Topamax. Try to gradually increase dose." *Id.* In April 2011, Mr. Deardorff called the VA clinic to "report[] having a headache over the last three days & not responding to [over the counter]: Aleve." *Id.* at 984. In January 2012, he went to the doctor "with headaches, symptoms off and on for the past three months." *Id.* at 711. He was assessed with "tension-type headaches" but the notes also state, "[h]eadaches localize to the front behind his eye and last[] for several days, suggestive of a component of a migraine." *Id.* at 711.

On February 6, 2013, he reported to Virginia Mol, a nurse practitioner at the VA clinic, that a "nerve block helped with neck pain," but his "headaches [were] only gone for few days." *Id*. at 358. On September 24, 2013, Mr. Deardorff called the VA to report "I think I need to see Doc Mol again for my headaches." *Id*. at 530. He stated that he was experiencing "bad headaches again, and I mean excruciating pain." *Id*. He reported that these headaches "last for days," further explaining that "he has about one of these headaches per month and each time the headache will last 2-4 days." *Id*.

On October 30, 2013, Mr. Deardorff had an appointment at the VA clinic to follow up on "neck pain and headaches. . . . Pain relief lasts [a] few months then he starts having more pain and headaches." *Id*. at 505. On November 6, 2013, Mr. Deardorff had an MRI of his cervical spine. The reason for the imaging states: "neck pain + headaches" and the clinical indication states "[n]eck pain, headaches, vertigo." *Id*. at 595.

On December 12, 2013, a VA provider reported a phone call with Mr. Deardorff. The notes state: "The veteran is endorsing ongoing difficulties with neck & back pain and debilitating migraine headaches." *Id*. at 1658. "The veteran is seeking treatment to alleviate the migraine headaches . . . ." *Id*. at 1659. The assessment states: "Persistent neck/back pain and migraine headaches. Impacting ability to work." *Id*.

On March 11, 2014, Mr. Deardorff was seen for a pre-surgery appointment. In addition to his neck and arm pain, he also complained "of significant occipital

6

headaches which radiate up into the top of his head. He is on medication for these but it offers no relief. He feels like these flare up when his neck is really bad." *Id*. at 480. And in his review of systems for that same visit, the box for "Migraines/H[eadaches]" is checked. *Id*. at 484.

On March 13, 2014, Mr. Deardorff had a cervical spine decompression and fusion surgery. On April 18, 2014, he had a post-surgery, follow-up appointment. The notes state: "His headaches are slightly better, although they are still present." *Id*. at 629.

On February 13, 2015, Mr. Deardorff had a one-year, post-surgery follow-up appointment. The notes indicate that at the six-month check-up in August 2014, "[h]e still had some continued headaches starting in the back of his neck and wrapping around to the forehead." *Id*. at 1065. The notes continue: "He gets those nearly every day, not severe enough to limit his activity." *Id*. at 1065-66.

On February 23, 2015, Mr. Deardorff was seen for complaints of bilateral hand numbness, but in reporting his symptoms he also reported "headaches, nausea, and vertigo accompanying neck symptoms (all predated surgery)." *Id*. at 1062. The notes indicate "[h]e takes tizanidine for headaches." *Id*.

On August 27, 2015, Mr. Deardorff called in to the VA clinic to report "that headaches get so intense over back of neck and around to both eyes, and thru the shoulders and radiates down arms. The pain feel[s] like sticking a dull butter knife and then shove in eye and remove it!" *Id*. at 2219. On August 28, 2015, he had a neurology consult at the VA clinic for his headaches. The notes state:

7

> He also describes a headache suspicious for migraine with aura. He has prodromal aura consisting of "shooting stars" across his visual field followed 30-60 minutes later by unilateral R occipital pain that radiates to the front and is accompanied by photophobia, phonophobia, nausea. OTC medications such as ibuprofen, Tylenol, aleve have not helped. He usually goes and sits in a dark room with minimal sounds. He says the headaches last for five days at a time.

*Id*. at 2214. He was assessed with having "migraine with aura" and he was started on a new medication – Verapamil. *Id*. at 2217.

### ii. District Court Decision

In his brief to the district court, Mr. Deardorff recounted most of the evidence outlined above. *See id*. at 2465-68. He argued the ALJ's conclusion that "there was no evidence of Mr. Deardorff's migraines is plainly incorrect" and "Mr. Deardorff's migraine headaches are a medically determinable severe impairment." *Id*. at 2481. He argued in the alternative: "Even assuming Mr. Deardorff's migraine headaches are non-severe (which Petitioner does not concede), the ALJ must still account for any limitations caused by all medically determinable impairments in his RFC." *Id*. at 2482.

Though the district court acknowledged "[t]he ALJ did not address Plaintiff's migraine complain[t]s at step two," *id*. at 2537, it then went on to state: "However, the ALJ proceeded to step three and considered Plaintiff's . . . migraine headaches when assessing Plaintiff's RFC." *Id*. In support of that statement, the district court cites to page 24 of the administrative record (which is page 48 of Appellant's Appendix). *See id*. at n.26. We do not see any support for the district court's statement on that page of the ALJ decision, or on any other page. *See id*. at 48;

8

42-51. The ALJ did not consider Mr. Deardorff's migraine headaches in assessing his RFC but instead stated there was no record evidence of migraines.

The district court then went on to characterize Mr. Deardorff's argument regarding his migraine headaches like this: "Plaintiff claims that the ALJ erred by giving little weight to Plaintiff's allegations that he suffered from . . . migraine headaches." *Id*. at 2538. But Mr. Deardorff did not argue about the weight the ALJ assigned to his allegations about his migraines. Rather, he argued the ALJ erred in concluding there was no evidence of migraines. He asserted that his migraines were a medically determinable severe impairment and he therefore wanted the case "remanded for consideration of [his] headaches and their limiting effects." *Id*. at 2482.

Further, the district court appears to have overlooked the evidence Mr. Deardorff cited to in support of his argument. In his brief to the district court, Mr. Deardorff cited to medical evidence in the record pertaining to his headaches. *See id*. at 2465-68 ¶¶ 38-52. The district court did not, however, acknowledge or discuss this medical evidence. Instead, the district court characterized the evidence supporting Mr. Deardorff's headache argument in this way: "Plaintiff cited the VA's disability determination in support of his claim that he suffered from migraine headaches." *Id*. at 2538-39. The court then noted, "[t]he ALJ, however, found that there was no evidence of record regarding Plaintiff's migraine symptoms." *Id*. at 2539 (internal quotation marks omitted). The district court then appears to provide a post-hoc rationale for rejecting Mr. Deardorff's argument (as characterized by the

court) by quoting a VA determination that Mr. Deardorff's "headaches are not prostrating in nature." *Id.* Those three sentences are the basis for the district court's conclusion that there was "no reversible error in the ALJ's decision to give little weight to Plaintiff's claim[] that he suffered from . . . migraine headaches." *Id.*

The district court ignored the medical evidence Mr. Deardorff presented in his brief about his headaches. And the district court made it seem as though the ALJ did consider Mr. Deardorff's headaches, but assigned them little weight. The district court's decision did not adequately address Mr. Deardorff's arguments that the ALJ erred in stating there was no evidence of record regarding his migraines and in failing to consider his migraines or headaches when formulating the RFC.

### iii. Commissioner's Arguments on Appeal

To defend the ALJ's silence on this issue, the Commissioner argues: "Medical providers believed that Deardorff's headaches were not migraine headaches but instead related to his neck condition, which the ALJ extensively discussed," Aplee. Br. at 44, and "[t]he ALJ's assessment of Deardorff's RFC addressed the supported limitations arising from his neck condition," *id.* at 43. While it is true that some providers—and even Mr. Deardorff himself at times—believed his headaches were related to his neck condition, the ALJ never made such a finding or statement. And, as noted above, there are other medical records that suggest Mr. Deardorff suffered from traditional migraines not associated with his neck condition. The ALJ did not acknowledge or discuss any of the evidence related to Mr. Deardorff's headaches. The Commissioner's post hoc rationale for the ALJ's failure to discuss the headaches

10

and any limitations they caused is not a basis on which the ALJ's decision can be affirmed. *See Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) ("The magistrate judge's (and appellee's) post hoc rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance. Judicial review is limited to the reasons stated in the ALJ's decision[.]" (citation omitted)).

Even if the headaches were not a separate impairment and even if they were related to the neck condition, the ALJ should have discussed them as a symptom of the neck impairment given the significant evidence in the record. As the ALJ noted in his decision, once he determines there is a medically determinable impairment, as he did with the neck condition, then he "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." Aplt. App. at 47.

In reviewing the evidence related to Mr. Deardorff's neck condition, the ALJ cited to medical records for some symptoms, but ignored the headache symptoms even though they are noted in those same records. For example, in referring to a medical record about Mr. Deardorff's worsening neck and arm pain, the ALJ discussed the symptoms of Mr. Deardorff's balance getting worse and his constantly dropping objects, *see id*. at 47-48 (citing Ex. 3F/13, which appears at Aplt. App. at 480). But that same record further states "[Mr. Deardorff] also is complaining of significant occipital headaches which radiate up into the top of his head. He is on medication for these but it offers no relief. He feels like these flare when his neck is

11

really bad." *Id*. at 480. Similarly, in discussing another medical record from one of Mr. Deardorff's post-surgery follow-up appointments, the ALJ noted Mr. Deardorff "complained of ongoing numbness in his bilateral upper extremities and tingling in his lower extremities." *Id*. at 48 (citing Ex. 7F/51, which appears at Aplt. App. at 813). But the ALJ did not mention Mr. Deardorff's complaints at the same appointment of "headaches, nausea, and vertigo accompanying neck symptoms." *Id*. at 813.

The Commissioner also appears to misrepresent the record by asserting that "the ALJ considered Deardorff's activities such as spending hours building and playing with model railroads—activities that show an ability to perform detailed work and concentrate for extended periods—*as inconsistent with constant, debilitating headaches*." Aplee. Br. at 45 (citing Aplt. App. 51, 606, 113) (emphasis added). There is no ALJ finding—on page 51 or elsewhere—about Mr. Deardorff's activities being inconsistent with "constant, debilitating headaches." The Commissioner's representation that such a finding exists is not accurate. The term "headaches" does not appear in the ALJ decision, and the term "migraines" is mentioned only twice in one paragraph. This argument is yet another attempt to provide an improper post hoc rationale for the ALJ's decision.

The ALJ erred by failing to discuss the significant evidence of Mr. Deardorff's headaches and how they might impact his functional abilities—either as a separate impairment or as a symptom of his neck condition. We therefore remand for the ALJ to consider the evidence of Mr. Deardorff's headaches in assessing his RFC.

B.

Mr. Deardorff next argues the ALJ erred in assessing his RFC by failing to include any limitations for his hands and arms, other than limitations on overhead reaching. He contends there was objective record evidence of other manipulative limitations related to his difficulties with carrying items without dropping them, decreased grip strength, loss of coordination, numbness and tingling. We do not necessarily agree with all aspects of this argument, but we do agree the ALJ needs to discuss additional evidence of Mr. Deardorff's hand limitations on remand.

The ALJ explained that, before his March 2014 spinal surgery, Mr. Deardorff's "[p]hysical examination revealed deficits caused by [his] cervical spine degeneration." Aplt. App. at 47. The medical records note Mr. Deardorff's diminished hand strength, and the ALJ observed that, "[Mr. Deardorff's] physical examination was consistent with his complaints that he repeatedly dropped objects." *Id*.

But the ALJ painted a different picture of Mr. Deardorff's hand issues after his surgery. At his post-surgery follow-up appointment in August 2014, the ALJ noted Mr. Deardorff reported some continued hand clumsiness but that he exhibited normal grip strength on examination. In February 2015, the ALJ noted Mr. Deardorff complained of ongoing numbness in his bilateral upper extremities. Upon examination, he did exhibit diminished sensation in his upper extremities, but had normal grip strength. To further support the determination that Mr. Deardorff did not have any manipulative limitations (other than limited overhead reaching due to

13

diminished sensation), the ALJ cited to three separate physical examinations from June, July and September 2015 where Mr. Deardorff exhibited normal strength in his bilateral extremities.

The Commissioner points to the ALJ's recitation of the post-surgery evidence showing Mr. Deardorff exhibited full grip strength to support the argument that "later evidence of full strength demonstrates why [the earlier finding of diminished hand strength] did not mandate the inclusion of additional manipulative limitations in Deardorff's RFC." Aplee. Br. at 48. The problem, however, is that "the ALJ's discussion appears only to highlight the physical exams in which Mr. Deardorff exhibited normal strength" and "does not appear to acknowledge that studies also showed Mr. Deardorff experiences decreased grip strength, impaired coordination and dexterity, altered deep tendon reflexes, or the fact that his hand numbness, weakness, and coordination cannot be corrected by neck surgery." Reply Br. at 6-7 (citing to Aplt. App. at 1062, 1172, 2203-05).

We agree with Mr. Deardorff that there is conflicting evidence from two physical examinations during the relevant time period, but the ALJ failed to discuss those examinations. In May 2015, Mr. Deardorff was seen at the VA clinic. On physical examination it was noted: "strength decreased in all extremities" and he was assessed with "decreased grip strength." Aplt. App. at 1172. In July 2015, Mr. Deardorff was again seen at the VA clinic. On physical examination, it was noted: "weakness, sensory loss or altered [deep tendon reflexes] suggestive of a peripheral nerve injury; . . . weakness and decreased dexterity in hands." *Id*. at

14

2203-04. There is also a note regarding an abnormal study in March 2015 that showed "electrodiagnostic evidence of bilateral median sensorimotor mononeuropathy at the wrists (carpal tunnel syndrome)." *Id*. at 2204. The record concludes with another note indicating Mr. Deardorff had been seen by "ortho spine and they do not feel his hand numbness, weakness, and coordination of hands are anything that can be improved with cervical surgery. Have recommended [patient] be seen in neuro." *Id*. at 2205.

"[A]n ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d at 1007, 1009-1010 (10th Cir. 1996). But "in addition to discussing the evidence supporting his decision, the ALJ also must discuss . . . significantly probative evidence he rejects." *Id*. "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004). The ALJ erred by failing to discuss the conflicting probative evidence noted above. The evidence demonstrated Mr. Deardorff's examination results were not all normal, but instead showed decreased grip strength, impaired dexterity, altered deep tendon reflexes, abnormal electrodiagnostic studies, and the inability for his hand issues to be improved with cervical surgery. On remand, the ALJ should discuss this conflicting evidence regarding Mr. Deardorff's hand issues (whether as a result of his neck impairment, carpal tunnel syndrome, peripheral neuropathy, or a combination of these impairments) when assessing his RFC.

C.

Mr. Deardorff also argues the ALJ erred in evaluating his treating source opinions and in assessing his credibility.  Because the ALJ did not consider the evidence regarding Mr. Deardorff's headaches or the conflicting evidence regarding his hand limitations, we decline to rule on these two issues as the ALJ's consideration of that evidence on remand may also impact these issues.

III.  Conclusion

For the foregoing reasons, we reverse and remand to the district court with instructions to remand to the agency for further proceedings consistent with this decision.

Entered for the Court


Terrence L. O'Brien
Circuit Judge

16