**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

JUDITH F. TUCKER,

Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

Defendant-Appellee.

No. 05-5118
(D.C. No. 04-CV-474-FHM)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Judith Tucker appeals from the district court's order affirming the

Commissioner's denial of Social Security disability benefits and supplemental

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

security income (SSI) payments. We have jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291, and we REVERSE and REMAND for further proceedings.

I.

Ms. Tucker applied for benefits on the grounds that she suffers from a seizure disorder, back pain, hypertension, an adjustment disorder, obesity, and other impairments. The administrative law judge (ALJ) issued a decision unfavorable to Ms. Tucker. The district court remanded for further proceedings, directing the Commissioner to determine whether Ms. Tucker met the criteria of seizure-related Listing 11.03 and to further evaluate Ms. Tucker's condition in other regards.

After two additional hearings, the ALJ determined that none of Ms. Tucker's impairments were severe enough to meet or equal Listings 11.02, 11.03, 12.02, or 12.04. *See* 20 C.F.R., part 404, subpart P, app. 1, §§ 11.02, 11.03, 12.02, 12.04. He found that her seizures were relatively well-controlled with medication, and that her back impairment did not impose substantial limitations on her ability to work. He further found that her mental impairments did not preclude her from doing simple and repetitive work activities. Thus, the ALJ determined that Ms. Tucker retained the residual functional capacity (RFC) to perform light work consisting of simple and repetitive tasks under seizure precautions. Given her mental restrictions, she could not perform any of her past relevant work, but the ALJ found that her RFC allowed her to perform jobs

-2-

available in significant numbers in the regional and national economies.  The ALJ

therefore denied benefits at step five of the five-step sequential evaluation

process.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Williams v. Bowen*,

844 F.2d 748, 750-52 (10th Cir. 1988) (explaining the five-step process).  The

Appeals Council denied review, and the district court affirmed the ALJ's

decision.  Ms. Tucker appeals.

## II.

### *Standard of Review*

"We review the [Commissioner's] decision to determine whether it is

supported by substantial evidence and whether the [Commissioner] applied the

correct legal standards."  *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)

(quotation omitted).  "We must examine the record closely to determine whether

substantial evidence supports the [Commissioner's] determination.  Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Id.* (quoting *Richardson v. Perales*, 402 U.S.

389, 401 (1971)) (further citation omitted).

### *Analysis*

Ms. Tucker argues that the ALJ erred in three respects:  (1) at step three,

by ignoring potentially applicable listings; (2) in evaluating her credibility; and

(3) at step five, by failing to propound proper hypothetical questions to the

vocational expert (VE).

A.

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quotation omitted). Ms. Tucker initially argues that the ALJ ignored the possibility that she met or equaled Listings 1.04 (musculoskeletal), 4.02 (chronic heart failure), and 4.03 (hypertensive cardiovascular disease).[1]

The district court's order of remand underlying the most recent ALJ decision did not mention these listings and there is no indication that Ms. Tucker's counsel requested the ALJ to consider these listings. In any event, while Ms. Tucker provides record cites for her back impairments, cardiac testing, and hypertension, she does not establish that she satisfies all of the requirements of Listings 1.04, 4.02, or 4.03. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (stating that the claimant has the "step three burden to present evidence establishing her impairments meet or equal listed impairments");

[1]     On appeal, Ms. Tucker has abandoned her argument that the ALJ erred in determining that her seizures did not satisfy the criteria for Listings 11.02 or 11.03. Aplt. Reply Br. at 5. She also has withdrawn her credibility-related argument regarding hypertension for failure to argue it in the district court. Aplt. Reply Br. at 11. She has not responded to the Commissioner's assertion that she also failed to argue before the district court that the ALJ did not consider her obesity in combination with other impairments. We generally do not consider arguments raised for the first time on appeal, *see Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994), and we abide by that general rule here.

-4-

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating that a claimant must show that her impairment "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *see also* 20 C.F.R. §§ 404.1525(d), 416.925(d) (stating the findings related in a listing must be met). Thus, we do not find reversible error in the ALJ's failure to discuss Listings 1.04, 4.02, and 4.03.

B.

Ms. Tucker next argues that the ALJ erred in discounting her credibility when making his RFC findings. Specifically, she contends that there is no substantial evidence supporting the findings that (1) her seizures are relatively well-controlled by medication and that side effects of her medication are manageable, and (2) her back impairment does not present significant limitations. She also argues that the ALJ failed to tie his credibility determination to the evidence. We agree with her arguments about her seizures and medications, but disagree with regard to her back impairment.

An adjudicator's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (1996). "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and

not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation and alteration omitted).

*Seizures*

The ALJ did offer specific reasons for discounting Ms. Tucker's credibility regarding the frequency of her seizures and the side effects of her medication, finding that (1) when under proper treatment, Ms. Tucker's seizures are largely controllable with medication, and (2) the side effect (sleepiness) can be reduced by controlling the dosage of Dilantin. He found the seizures controllable primarily by relying upon the opinion of a testifying medical expert.[2] He also stated that Ms. Tucker's medical records failed to support her allegations that her seizures had been uncontrolled despite compliance with medication, and he noted November 2003 medical records showing that Ms. Tucker had only two seizures in three months and January 2004 medical records indicating that she had no grand mal seizures and only two smaller seizures since November 2003.

We note that these proceedings have been lengthy, including a remand from the district court and additional administrative proceedings. Thus, the period under consideration for disability benefits stretches from the date of alleged onset, March 4, 1995, to the date last insured, March 31, 2001, and the period

[2] The ALJ primarily discussed the medical expert's opinion in connection with determining whether Ms. Tucker met or equaled the listings for seizure disorders. Aplt. App. 3 at 433. He explicitly referred to the expert's testimony again, however, in conjunction with his evaluation of Ms. Tucker's credibility and her RFC. *Id.* at 437.

under consideration for SSI stretches from the protective filing date, July 28, 1997, to the date of the ALJ's decision, April 1, 2004. The ALJ's decision does not materially focus on the different periods, even though Ms. Tucker underwent different treatments during these time frames. Importantly, while the record contains evidence that Ms. Tucker's seizures were controllable for at least one portion of the time, it does not necessarily support such a determination for the entirety of either period under consideration.

The medical expert testified that usually when Ms. Tucker has seizures she is off medication or her medication is at subtherapeutic levels. Aplt. App. 3 at 499-500, 510. Ms. Tucker's medical records, however, generally refute this proposition. She was prescribed carbamazepine (brand names Epitol and Tegretol) even before the alleged disability onset date, March 4, 1995, and medical records from July 1994 and January 1995 show her to be within therapeutic levels. Aplt. App. 2 at 202, 247. In January 1996, she admitted to one seizure per week. *Id.* at 228. In June 1997, her doctor reported breakthrough seizures despite medication. *Id.* at 301. Tests on November 5, 1997, confirmed a therapeutic level of Tegretol. *Id.* at 277. By early 1998, her doctor reported that her seizures were under control with medication. *Id.* at 307; *see also id.* at 355. This state of affairs apparently did not continue, however, as in August 1998 she reported she was having seizures often. *Id.* at 398. On September 15, 1998, she reported having a seizure the previous weekend, and she was barely within the

therapeutic range. *Id.* at 394-95. In early 1999 her doctors decreased her levels of Tegretol, and she reported no seizures. *Id.* at 372. On February 12, 1999, she reported increased seizure activity, yet she again tested within therapeutic levels. *Id.* at 367-68. In April 1999, she reported two seizures per week. Aplt. App. 3 at 672.

For some months (particularly late 1999 through early 2001), there is little evidence of medication levels or treatment for seizures, and there is evidence that Ms. Tucker was not always taking her medications. *Id.* at 670 (October 28, 1999, notation that she has been out of most medications for some time); *id.* at 665 (March 24, 2000, notation that she is unable to afford her blood pressure medications); *id.* at 663 (April 25, 2000, notation that she is unable to afford her medications). To the extent that the ALJ relies on noncompliance with prescribed treatment to deny benefits, though, he must develop the record as to noncompliance and determine (1) whether the treatment could restore the ability to work and (2) whether the claimant's failure to follow treatment is justifiable. *See* Soc. Sec. Rul. 82-59, 1982 WL 31384, at *2 (1982); *see also* Soc. Sec. Rul. 87-6, 1987 WL 109184, at *4 (1987) (indicating that if a claimant does not meet the seizure-related listings but may be found disabled because his or her RFC does not allow him or her to work, the ALJ must address the issue of failure to follow prescribed treatment). In this regard, the record is replete with references to Ms. Tucker's financial problems and alleged inability to afford her

medications, *see, e.g.*, Aplt. App. 2 at 285, 303, 357; Aplt. App. 3 at 622, 624-26, 652, 663, 665, 668, and an individual's inability to afford treatment may constitute justifiable cause for failing to comply with prescribed treatment. Soc. Sec. Rul. 82-59, 1982 WL 31384, at *4.

Ms. Tucker's medical records for the SSI-only period (April 1, 2001, through April 1, 2004) also do not support the medical expert's opinion. Rather, they show that at least since fall 2002 Ms. Tucker has complained of seizures during or near visits when her medication was within, or even above, therapeutic levels. On August 28, 2002, she was prescribed Dilantin for seizure control. Aplt. App. 3 at 585. On November 25, 2002, she reported a seizure the day before, yet tests were just within therapeutic levels. *Id.* at 598, 633. On January 8, 2003, she stated that she averages one or two episodes per week while on Dilantin (compared to at least two episodes per day when she ran out of medication). *Id.* at 627. Less than two weeks later, she tested within therapeutic levels. *Id.* at 596. On May 29, 2003, she reported having a seizure the day before, yet she again tested within therapeutic levels. *Id.* at 594, 616. Similarly, on September 19, 2003, she was treated for a seizure while testing within therapeutic levels. *Id.* at 588, 603. By October 2003, she was listed as taking "Clonopin" (presumably Klonopin, a brand of clonazepam) as well as Dilantin. *Id*. at 722; *see also id.* at 713, 715, 718 (listing clonazepam among her medications). Finally, on December 17, 2003, she reported she was taking

medications regularly and still experiencing seizures. *Id.* at 715. Her tests showed that she was just slightly above therapeutic levels. *Id.* at 716; *see also id.* at 613, 593 (July 24, 2003, report that she is "still hav[ing] seizures but not as often" and test showing above-therapeutic levels); *id.* at 718-19 (November 21, 2003, report of two seizures in past three months; test above therapeutic levels); *id.* at 713-14 (January 20, 2004, report of two small seizures in past month; test above therapeutic levels). Because the medical expert's opinion is not supported by the medical evidence, it does not constitute substantial evidence to support the ALJ's decision.

The medical expert also testified that dosages of anti-seizure medications could be reduced to minimize sleepiness or that if necessary a patient could take other medications. There is no evidence, however, that either of these propositions applies to Ms. Tucker. As discussed above, Ms. Tucker reported seizure activity at therapeutic levels of Tegretol/Epitol and at therapeutic levels of Dilantin, even after clonazepam was added. *See id.* at 603 (notation that the day after Dilantin was decreased, she experienced a seizure). On this record, it is speculative to determine that she could lessen her dosages and still control her seizures. Moreover, the record shows that before trying Dilantin and clonazepam, Ms. Tucker had tried at least one other medication (carbamazepine), which

apparently was not as effective as the Dilantin.[3] *See id.* at 627 (doctor's note reporting that she has improved on Dilantin, though she still suffers episodes). Considering whether other medications, not yet tried, would be effective and not incur side effects is also speculative. *See also* Soc. Sec. Rul. 82-59, 1982 WL 31384, at *2 ("Where [the Social Security Administration] believes that treatment might restore an individual's ability to engage in any [substantial gainful activity], but no treating source has prescribed such treatment, a determination of allowance will be made, and the [disability determination services] will refer the individual to [vocational rehabilitation].").

As for the records from November 2003 through January 2004, it appears that Ms. Tucker had fewer seizures because she was over-medicated during this period. Tests on or near these dates reflected above-therapeutic levels of Dilantin. Aplt. App. 3 at 714, 716, 719; *see also id.* at 613, 593 (July 2003 reports of seizures, but not as often, and test showing above-therapeutic level of Dilantin). And in addition to the Dilantin, Ms. Tucker was taking clonazepam at this time. *Id.* at 713, 718, 722. Correlating with the over-medication, medical records also reflect that Ms. Tucker appeared somnolent and complained of

---

[3]     Both the medical expert and the district court relied on a statement in the record that on February 18, 1999, Ms. Tucker told her doctors, "I'm doing great, this medication works." Aplt. App. 2 at 366. It is difficult to determine whether this statement refers to her seizures, though, because it appears that this visit focused on Ms. Tucker's blood pressure medications, Catapres and Cardizem, not her seizure medications.

excessive sleepiness. *Id.* at 674, 718, 722. Thus, these records do not support the ALJ's finding that Ms. Tucker's seizures are controllable at a level of medication that does not also cause side effects. In addition, these records relate only to the last few months of the SSI period, and therefore they do not constitute substantial evidence of the controllability of her seizures during the disability period or earlier in the SSI period.

For these reasons, the ALJ's RFC findings regarding the controllability of Ms. Tucker's seizures and the potential side effects of her medications cannot stand.

*Back Impairment*

Unlike our concerns about the ALJ's evaluation of her seizure disorder, however, we do not find persuasive Ms. Tucker's contentions about the ALJ's discounting her credibility with regard to her back impairment. The record offers no support for her argument that she has been diagnosed with osteoarthritis of the back; rather, it appears that osteoarthritis was discussed in connection with her knee. *See* Aplt. App. 2 at 220, 298. While the record does reflect some complaints of and treatment for back pain, it does not require a conclusion of disabling pain or otherwise indicate that the ALJ reversibly erred in his determination.

C.

Finally, Ms. Tucker argues that the ALJ erred by failing to propound hypothetical questions to the VE that properly considered the effects of Ms. Tucker's seizures and medications, her back impairment, and weak grip. We agree with regard to her seizures, but disagree with regard to her back and hand impairments. "At step five of the sequential analysis, an ALJ may relate the claimant's impairments to a VE and then ask the VE whether, in his opinion, there are any jobs in the national economy that the claimant can perform." *Winfrey*, 92 F.3d at 1025. Here, despite acknowledging that Ms. Tucker suffers from occasional seizures, even with medication, the ALJ did not include in his hypothetical questions any explicit references to her seizures, including whether and how her suffering occasional seizures or suffering seizures while at work (and any accompanying after-effects) might affect her employability. Ms. Tucker's attorney partially ameliorated this omission by inquiring how absenteeism would affect her ability to work, and the VE replied that any more than one absence per month "would begin to run into problems." Aplt. App. 3 at 546.

While one could say that the ALJ's inclusion of seizure precautions (avoiding heights, open machinery, and operating vehicles) implicitly conveyed the existence of the seizure disorder to the VE, this court has held that "[t]estimony elicited by hypothetical questions that do not relate *with precision* all of a claimant's impairments cannot constitute substantial evidence to support

-13-

the [Commissioner's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation omitted; emphasis added); *see also Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995) (restating "the established rule that such inquiries must include all (and only) those impairments borne out by the evidentiary record"). The omission of any specific information about Ms. Tucker's seizures from the ALJ's hypothetical questions — such as potential frequency, type of seizure activity, and any post-ictal effects found by the ALJ — undermines the VE's testimony about jobs potentially available to Ms. Tucker and the ALJ's determination that she can engage in substantial gainful activity despite her seizure disorder.

The ALJ did not err, however, in neglecting to include more information about Ms. Tucker's back impairment in his hypothetical questions. With the exception of lifting, which the hypothetical question addressed, the ALJ found no significant limitations resulting from the back impairment, and substantial evidence supports this finding. Hypothetical questions "need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996).

As for weak grip, Ms. Tucker's counsel inquired of the VE whether Ms. Tucker's grip restrictions had any impact on the jobs identified by the VE, and the VE testified that they did not. Thus, this information was before the ALJ. Although Ms. Tucker complains on appeal that the ALJ's questions did not

-14-

address any restrictions on fingering and handling, there is no substantial evidence that Ms. Tucker's weak grip also involves restrictions on fingering or handling.

## III.

Ms. Tucker requests that this court order an immediate award of benefits, a remedy within our discretion. *See Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993). "Some of the relevant factors we consider are the length of time the matter has been pending and whether or not given the available evidence, remand for additional fact-finding would serve any useful purpose but would merely delay the receipt of benefits." *Salazar v. Barnhart*, __ F.3d __, 180 F.App'x 39, 50 (10th Cir. 2006) (quotation, alteration, and citation omitted). We recognize that this matter has been pending for over nine years, but far from serving no purpose, additional fact-finding and consideration by the ALJ is appropriate in this case. Thus, Ms. Tucker's request for an immediate award of benefits is denied. The judgment of the district court is REVERSED, and the case is REMANDED to the district court with instructions to remand the case to the agency for further proceedings consistent with this order and judgment.

Entered for the Court

Stephen H. Anderson
Circuit Judge