**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 11, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SUZAN L. MADRON,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,[*]

      Defendant-Appellee.

No. 06-1200
(D.C. No. 05-cv-869-WDM)
(D. Colo)

---

**ORDER AND JUDGMENT**[**]

---

Before **KELLY**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

---

Claimant Suzan L. Madron appeals the district court's decision affirming the

Commissioner's denial of her applications for supplemental security income and

disability insurance benefits. Ms. Madron asserts that she is disabled by back pain, ankle

pain, and asthma. But the Commissioner determined that she had sufficient capacity to

either return to her previous work or take other jobs that were available in the national

economy. We conclude, however, that the Commissioner's determinations regarding the

---

[*]     Pursuant to Fed. R. App. P. 43(c)(2), Michael J. Astrue is substituted
for Jo Anne B. Barnhart as defendant in this appeal.

[**]     This Order and Judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

severity of Ms. Madron's pain are not supported by substantial evidence. Exercising our jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we **REVERSE** and **REMAND** with instructions to the Commissioner to award benefits.

## I. BACKGROUND

Ms. Madron filed a Title XVI application for supplemental security income and a Title II application for disability insurance benefits. She claims that she has been unable to work since December 15, 2002, because back pain and respiratory problems make it "very hard to walk or bend or br[e]ath[e]." Admin. R. at 61, 84. Both applications were denied. Ms. Madron requested, and was granted, a hearing before an administrative law judge ("ALJ"). Three months before the hearing, she fell and broke her ankle. Ms. Madron asserted that her ankle has not healed properly and that pain in it has contributed to her disability. The ALJ denied the applications, concluding that although Ms. Madron had severe impairments, she could return to her previous work as a cashier. The ALJ further determined that, even if she was no longer capable of performing her previous job as it would actually or customarily be performed, Ms. Madron was capable of performing other jobs that existed in significant numbers in the national economy. Ms. Madron requested review of the ALJ's decision. The Appeals Council denied her request, rendering the ALJ's decision the final decision of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Ms. Madron then filed this action, and the district court affirmed the Commissioner's decision.

*Ms. Madron's Personal and Medical History*

Ms. Madron was born in 1955.  Although she completed the eighth grade, she has great difficulty reading.  Most of her previous jobs have required only unskilled labor.  In 1996, she worked at an airport, loading and unloading containers of food onto airplanes.  While on that job in 1996, she injured her back and hips and, as a result, was out of work until 1998.  After her recovery, she was employed at a number of different convenience stores, working as a cashier and stocker.  Her last job was as a seasonal employee at Walmart, where she worked as a cashier from September to December 2002.  She has not worked since that time.

In 2002 and 2003, Ms. Madron was seen by Dr. Lawrence A. Lesnak, who initially diagnosed her with a number of pain-causing conditions: chronic right-sided sacroiliitis,[1] chronic lumbosacral myofascial pain,[2] and L5 and S1 radiculopathies.[3]  In February

---

[1]  "Sacroiliitis" is an "[i]nflammation of the sacroiliac joint." *Stedman's Medical Dictionary* 1587 (27th ed. 2000). The sacroiliac joint refers to the area between the hip bone and pelvis.  *See id.* at 875, 937, 1588.

[2]  Chronic lumbosacral myofascial pain is a chronic muscle pain concentrated near the pelvis. *See Stedman's Medical Dictionary* 1034 (defining "lumbosacral" as "[r]elating to the lumbar vertebrae and the sacrum"); *id.* at 1173 (defining "myofascial" as "[o]f or relating to the fascia surrounding and separating muscle tissue"); *id.* at 1588 (defining "sacrum" as "[t]he segment of the vertebral column forming part of the pelvis").

[3]  "Radiculopathy" is a "[d]isorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1503; *see also The Merck Manual* § 14 at 1488 (17th ed. 1999) ("Nerve root dysfunction, which is usually secondary to chronic pressure or invasion of the root, causes a characteristic radicular syndrome of pain and segmental neurologic deficit.").

2003, Dr. Lesnak reported Ms. Madron's subjective complaints of worsening pain and noted the possibility that her radiculopathy was worsening. In August 2003, he performed a number of tests, which confirmed that Ms. Madron had moderately severe radiculopathy. As a result of these tests, Dr. Lesnak gave Ms. Madron a prescription for medication to help control her symptoms. Dr. Lesnak repeatedly encouraged Ms. Madron to have a magnetic resonance imaging ("MRI") performed to aid with further diagnosis and treatment. Although the procedure was scheduled at one point, the MRI was never performed because Ms. Madron could not afford it. Eventually, Ms. Madron stopped seeing Dr. Lesnak altogether, because she lacked insurance. Instead, she went to Clinica Campesina where she continued to be treated for lower back pain, radiculopathy, and decreased strength.

In March 2004, Ms. Madron fell and fractured her ankle. She was referred to an orthopedic specialist, Dr. Michael Wertz, who recommended surgery. She did not have the operation; she would have had to pay half of the costs prior to the surgery, which she could not afford. As of June 2004, she was awaiting an opening for low-cost surgery at the University Hospital. At the hearing before the ALJ, she was wearing a half-cast to support her ankle.

Ms. Madron also has a history of moderate to severe asthma. However, she has been able to control her symptoms. She takes daily medication and participates in an asthma management class. She has reduced her smoking from three packs per day to less than one. In 2002, she quit smoking entirely for two weeks and her pulmonary function

returned to normal. Her doctors found that, with treatment, Ms. Madron can manage her asthma and is "[a]ble to be as active as [she] desires." Admin. R. at 199.

On May 12, 2003, Dr. George Twombly, a state agency physician, reviewed Ms. Madron's medical records and completed a residual functional capacity ("RFC") assessment. Dr. Twombly concluded that Ms. Madron could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk four hours in an eight hour workday (with a cane needed only for prolonged standing or walking on uneven surfaces), and sit about six hours in an eight hour workday. Among the few other limitations noted were the need to avoid prolonged exposure to extreme cold, avoid jolting motions to the lower back, and avoid walking on uneven surfaces or unprotected heights. Dr. Twombly noted that there were "[s]ome inconsistencies" in her statements and that Ms. Madron had "only partial credibility." *Id.* at 142.

*Hearing Testimony*

At the hearing before the ALJ in June 2004, Ms. Madron described "stabbing" pain in her right side, particularly in her back and leg. *Id.* at 26. She stated that she was able to do some light housework, including dusting, making her bed, and "maybe do[ing] some dishes," but she could not vacuum and, because she is unable to bend down, she could not mop. *Id.* at 30. She depended on the aid of a friend, who was also a certified nurses' assistant, to help her to do her grocery shopping and housework. She reported that she could sit for five to fifteen minutes, stand for five to ten minutes, lift ten pounds with her left hand, and lift hardly anything with her right hand alone. She stated that her

pain medications made her dizzy, sleepy, and lightheaded.

After asking Ms. Madron about her capacities, the ALJ posed several questions to a vocational expert ("VE") who joined the hearing by telephone. The ALJ asked if a person who was limited to light exertional work and could only stand or walk for two hours in an eight hour workday was capable of working at any of Ms. Madron's previous jobs. The VE testified that, with those limitations, Ms. Madron would be able to work as a "cashier II." *Id.* at 45. The VE explained that even if the specific jobs Ms. Madron had held required more standing or walking than she was currently capable of, others in that job category would allow for such restrictions. The ALJ also asked whether there would be jobs available at the national or state level for an individual with the same restrictions he had previously described that did not require reading, taking into account Ms. Madron's age, education, and work experience. The VE replied that "there would be some real unskilled, light occupations that would fit within the hypothetical" and provided two examples: "an inspector hand packager" and "a small products assembler." *Id.* at 45-46. Ms. Madron's counsel inquired whether these two jobs could be performed by someone who needed to take five minute breaks every fifteen to twenty minutes, and the VE replied that neither job would permit this.

### The ALJ's Decision

In October 2004, the ALJ issued his decision, applying the five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; s*ee also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988)

(describing the five-step process). At step one, the ALJ found that Ms. Madron had "not engaged in substantial gainful activity since December 15, 2002."[4] Admin. R. at 20. At step two, he concluded that Ms. Madron's medical conditions—chronic pulmonary insufficiency, moderately severe lumbar radiculopathy due to a right side nerve injury, and a nondisplaced fracture in her left ankle—constituted severe impairments. At step three, the ALJ compared Ms. Madron's conditions to the list of impairments that are conclusively presumed to be disabling. 20 C.F.R. §§ 404.1520(d), 416.920(d). None of her injuries matched a listed impairment. Turning to steps four and five, the ALJ reviewed the evidence and assessed her residual functional capacity. The ALJ concluded that Ms. Madron was capable of light exertional work with the sole additional limitation of standing or walking no more than two hours in an eight hour workday. The only non-physical limitation he assessed was a limited education with a reading level of one.

In reaching his conclusions about Ms. Madron's physical limitations, the ALJ reviewed the office notes of Dr. Lesnak and Dr. Wertz and noted that "no treating or examining physician has indicated that she is incapable of working." Admin. R. at 17-18.

---

[4] In her reply brief, Ms. Madron argues, for the first time, that she became disabled in February 2002. She notes that the ALJ found that her "work activities subsequent to February 2002 either comprised unsuccessful work attempts or did not generate the requisite earnings necessary for substantial gainful activity as defined in 20 CFR 404.1574 and 416.974." Admin. R. at 15. But Ms. Madron has consistently maintained, beginning with her initial application for disability benefits, *id.* at 61, and continuing through her opening appellate brief, Aplt. Br. at 2, that she was not disabled until December 15, 2002. Therefore, any claim that she was disabled before that date has been waived. *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue.").

To the extent that she complained about side effects of her medications, the ALJ noted that Ms. Madron had not mentioned any significant side effects to her physicians. He found that her ankle fracture did not qualify as a disabling impairment because, with appropriate treatment, including surgery, it should resolve itself within twelve months of the injury. The ALJ discounted Ms. Madron's account of the severity of her pain on the ground that her testimony was "not totally credible." *Id.* at 18. He also noted that he had "considered the administrative findings of fact made by the State agency medical physicians and other consultants" in accordance with Social Security Ruling 96-6p. *Id.* at 19.

Step four requires the ALJ to determine whether, in light of her residual functional capacity, Ms. Madron's impairment "prevents [her] from performing work [s]he has performed in the past." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). Based on the VE's testimony, the ALJ concluded that Ms. Madron could return to her previous work as a "cashier II." Admin. R. at 19-20. The ALJ further concluded that even if she could not return to her previous work, she was capable of other jobs existing in significant numbers in the national economy. Therefore, the ALJ also ruled that Ms. Madron was "not disabled" at step five. *Id.* at 21.

Ms. Madron filed a complaint in federal district court appealing the ALJ's decision. The court concluded that the ALJ's decision was both supported by substantial evidence and free from legal error. This appeal followed.

## II. DISCUSSION

"We review the Commissioner's decision to determine whether his factual findings are supported by substantial evidence in the record viewed as a whole and whether he applied the correct legal standards." *Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007) (alterations and quotation marks omitted) (quoting *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted) (quoting *Castellano*, 26 F.3d at 1028). In this inquiry, we may "neither reweigh the evidence nor substitute our judgment for that of the agency." *Id.* (quotation marks omitted) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

Ms. Madron argues that the ALJ erred at steps four and five of the sequential analysis. Step four is comprised of three phases:

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (citations omitted). If the claimant successfully shows that she cannot return to past relevant work, the burden of proof shifts to the Commissioner at step five to show that the claimant

retains the capacity to perform an alternative job that is available in the national economy in light of the claimant's age, education, and work experience. *See Williams*, 844 F.2d at 751.

On appeal, Ms. Madron argues that the RFC used to determine that she was not disabled at steps four and five was erroneous because the ALJ wrongly discounted the credibility of her subjective testimony. She also argues that, independent of any RFC error, the ALJ made numerous other errors in reaching his conclusions at step four and step five—primarily regarding the use of the vocational expert's testimony.

### A. Ms. Madron's Credibility

The ALJ must consider the credibility of Ms. Madron's subjective testimony about her pain, and also its effect on her ability to work, as part of the determination of her residual functional capacity. *See* Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 ("[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."). When addressing an ALJ's credibility determination, we bear in mind two principles. On one hand, "[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation marks omitted) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)). On the other hand,

"findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (alteration and quotation marks omitted) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).

Ms. Madron argues that the ALJ's decision to discount her credibility was not supported by substantial evidence and that he failed to sufficiently evaluate the required factors from SSR 96-7p. The ALJ concluded that Ms. Madron's testimony at the hearing regarding the severity of her impairments and limitations was "not fully credible" because it was inconsistent with the medical evidence and her reported daily activities. Admin. R. at 16. We will address separately each of her severe impairments and the factors the ALJ relied upon to discount Ms. Madron's testimony about the limitations they imposed.

*1. Pain From Back Injury*

Under our established framework for analyzing the credibility of testimony regarding disabling pain, we must consider:

> (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

*Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993)).

It is undisputed that Ms. Madron's impairment is supported by objective medical evidence and that her allegations of pain are connected to that impairment. Dr. Lesnak's

physical examinations in October 2002 and February 2003 detailed the way that various movements gave her pain. At her February 2003 visit, Ms. Madron was limping and using a cane and reported worsened pain. Dr. Lesnak observed that her legs displayed "give-way weakness secondary to her pain," and he noted "[p]ossible worsening lumbar radiculitis/radiculopathy." Admin. R. at 217. Later that month, Ms. Madron received injections for her pain. When she returned in April 2003 for a followup, her limping was more pronounced. Objective tests performed in August 2003 confirmed her physician's diagnosis of lumbar radiculopathy, and the ALJ accepted this as a severe impairment. Thus, the only question for which the ALJ needed to assess Ms. Madron's credibility pertained to the severity of her pain.

The ALJ said that he considered the seven factors from SSR 96-7,[5] and relied on a

---

[5]     Those factors are:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain . . . ; and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186 at *3. *See also Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004) (noting that an ALJ should consider these factors).

number of those factors in discounting Ms. Madron's statements about her pain. The ALJ noted that Ms. Madron's self-reported daily activities prior to her ankle fracture were "consistent with the ability to perform work activity." *Id.* at 18. He also acknowledged that "no treating or examining physician has indicated that she is incapable of working." *Id.* He found that her complaints about side effects from the medication were undercut by the fact that she "has not complained to doctors about significant side effects of medications." *Id.* Relatedly, he stated that her "failure to follow prescribed medical treatment" by not having an MRI performed was "inconsistent with her allegation of inability to work due to a disabling impairment." *Id.* The ALJ also noted that Ms. Madron's continued purchase of cigarettes was inconsistent with her alleged inability to afford medical treatment. He also cited inconsistencies in Ms. Madron's statements in the record on other matters as "cast[ing] doubt upon her credibility regarding the severity of her impairments and limitations." *Id.*

Reviewing the record as a whole, we cannot agree that the ALJ's credibility finding is supported by substantial evidence. First, Ms. Madron's self-reported daily activities do not undercut her allegations of disabling pain. The ALJ found that her self-reported activities were "consistent with the ability to perform work activity" and recounted that Ms. Madron "testified that she performed all household chores, including cleaning (vacuuming and mopping) dusting, making beds, and doing dishes." *Id.* However, this finding is contradicted by the hearing transcript. Ms. Madron testified that while she tried to do some housework, she required assistance for many everyday tasks.

She specifically testified that she could *not* vacuum or mop. *Id.* at 30.

Further, Ms. Madron's testimony about her limited daily activities is supported by her prior statements to the agency. The ALJ must consider the consistency of the claimant's own statements "at each prior step of the administrative review process." SSR 96-7p, 1996 WL 374186, at *5; *cf. Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (upholding credibility decision that relied in part on a claimant's "daily activities and contradictions in her various reports regarding them"). In her initial application for disability benefits, Ms. Madron painted a detailed picture of her limitations. She reported that she could care for her personal needs, cook meals, and travel to the grocery store and the doctor, but asserted that she could "not [do] very much" of her household chores "because of the pain." Admin. R. at 104-05. On another questionnaire, she asserted that the only household activity she could perform was "cooking if I don't have to stand very long" and that a friend helped her with the rest of her activities. *Id.* at 108. She also clarified that she could not clean or do laundry.

In her request for reconsideration, Ms. Madron asserted that she could no longer walk without a cane or drive. In forms submitted on June 2, 2003, she reiterated that she could not walk without a cane or drive and stated that her pain had worsened. It is not clear whether the ALJ considered these supporting statements, but there is no evidence in the record which contradicts Ms. Madron's report of her daily activities. Furthermore, even if Ms. Madron were capable of doing some housework, the "sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in

substantial gainful activity." *Thompson*, 987 F.2d at 1490 (alteration in original) (quoting *Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987)). Therefore, the ALJ erred in concluding that her testimony about her daily activities undercut her credibility as to the severity of her pain.

Second, the fact that no physician stated in the record that Ms. Madron was unable to work does not seriously undercut her credibility. "While the absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations." *Hamlin*, 365 F.3d at 1220 (alterations and quotation marks omitted) (quoting *Luna v. Bowen*, 834 F.2 161, 165 (10th Cir. 1987)); *see also* SSR 96-7p, 1996 WL 374186, at *6 ("[A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence."). Here, the medical tests establish a basis for the pain, although the physicians' statements and tests do not conclusively prove Ms. Madron's claims about the extent of her pain. However, this does not justify disregarding Ms. Madron's claims. And the ALJ points to no specific way in which the medical record is inconsistent with Ms. Madron's assertions that could justify disregarding her claims.[6]

---

[6]     We accept the ALJ's conclusion that Ms. Madron's assertions about the side-effects of her pain medications are made less credible by her failure to address the issue with her physicians. However, because the side-effects are neither asserted as an excuse for failing to take the medication nor asserted as

(continued...)

Third, a claimant's failure to follow prescribed medical treatment can suggest that her pain is less than alleged. *See* SSR 96-7p, 1996 WL 374186, at *7 (observing that a claimant's credibility may be undermined "if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"); *see also Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) ("The fact that [claimant] regularly exceeded the work restrictions recommended by his doctors was relevant to the credibility of his testimony concerning disabling pain."); *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (finding relevant to the credibility decision that "claimant's testimony appears to support a conclusion that he had not regularly taken the pain medication prescribed by his physician"). But "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7. The fact that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services" is a legitimate excuse. *Id.* at *8. Ms. Madron consistently maintained that she could not afford an MRI. Dr. Lesnak, who recommended the MRI, noted that it "cannot be performed until she obtains health insurance." Admin. R. at 211. Moreover, Ms. Madron's claimed inability to pay for an

---

[6](...continued)
additional reasons she cannot work, it is not clear what relevance this conclusion has to the credibility of Ms. Madron's testimony about disabling pain.

- 16 -

MRI is consistent with her long history of struggling to pay her medical expenses. Ms.

Madron has indicated that she is unable to afford the operation needed to repair her

broken ankle. She occasionally has had to go without her asthma medication because it is

too expensive. And she started going to Clinica Campesina when she could no longer

afford private doctors. On this record, Ms. Madron's failure to pay for an MRI is not

substantial evidence of overstated pain.[7]

---

[7] We are unwilling to accept the reasoning of the ALJ that Ms. Madron's stated inability to afford the recommended MRI procedure is questionable and reflects adversely on her credibility because of her continued purchase of cigarettes. The only case the Commissioner cites as support for using such reasoning involves *comparable* costs of the medical services needed and the amount of cigarettes purchased. In *Sias v. Sec'y of Health & Human Servs.*, the claimant was instructed by his physician to buy support hose that would cost roughly $100 and last for two to three months. 861 F.2d 475, 477 (6th Cir. 1988) (per curiam). However, the claimant did not purchase the support hose, claiming they were too expensive. *Id.* at 480. Instead, against the advice of his doctor, he continued to purchase two packs of cigarettes a day. *Id.* at 477. The Sixth Circuit took judicial notice of the cost of purchasing two packs of cigarettes per day and, comparing those costs to the cost of the support hose, which was provided in the record, "calculate[d] that the cost of the hose could have been covered by the savings the claimant would realize if he gave up cigarettes." *Id.* at 480.

Even if we were to adopt the Sixth Circuit's reasoning, we would not extend it to this case. Without full information about the total costs of the recommended MRI, we cannot conclude that ceasing smoking would positively affect in a meaningful way Ms. Madron's financial ability to avail herself of it. Indeed, in apparent recognition that insofar as they are analytically significant, the costs savings from quitting smoking must be assessed in relation to the costs of the medical procedure at issue, the Sixth Circuit appears to have given *Sias* a narrow reading. *See McKnight v. Sullivan*, 927 F.2d 241, 242 n.1 (6th Cir. 1990) (per curiam) (rejecting the government's assertion that *Sias* creates a general presumption that a claimant that smokes can afford basic medical care; noting that "[l]eaving aside the objection that surgery is not 'basic medical care,' the *Sias*

(continued...)

- 17 -

Finally, the ALJ relied upon "inconsistencies regarding her statements in applications for public assistance" to discount Ms. Madron's testimony. Admin. R. at 18. This is undoubtedly a relevant consideration. *See Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir 1988) (noting that "[t]he ALJ can weigh and evaluate numerous factors in determining the credibility of pain testimony," including "subjective measures of credibility that are peculiarly within the judgment of the ALJ" as well as "the motivation of . . . the claimant"). However, the only instance the ALJ identifies is an apparently untruthful statement, unrelated to these social security claims, in two food assistance applications in 2002. Contrary to Ms. Madron's claim that she lived apart from her husband who was disabled, an investigator concluded that they resided together and that Donald Madron was self-employed, owning his own auto repair shop. To whatever extent this demonstrates a general willingness to be untruthful on applications for government assistance, it is not enough, standing alone, to discount Ms. Madron's specific allegations of pain and other limitations relevant to her residual functional

---

[7](...continued)
decision held that the claimant could afford to buy *support hose* if claimant could support his cigarette habit"). Thus, on this record, we would not rely on Ms. Madron's continued smoking as a basis for questioning the credibility of her assertion that she could not afford the recommended MRI. The ALJ applied a similar smoking-based credibility analysis to Ms. Madron's pain claims related to her ankle injury, questioning Ms. Madron's failure to obtain the recommended corrective surgery. As noted *infra* in text, we need not definitively opine regarding the sufficiency of the ALJ's credibility analysis in the context of Ms. Madron's ankle injury. However, suffice it to say based upon the foregoing that the ALJ's smoking-based credibility analysis concerning the ankle injury would be open to serious question.

- 18 -

capacity.

Nor do all of these items, taken together, provide a sufficient basis for rejecting Ms. Madron's subjective complaints of disabling pain. This is particularly true because it is not clear to what extent the ALJ relied upon his mistaken view of the record regarding Ms. Madron's daily activities. *See Frey*, 816 F.2d at 517 (noting that while we ordinarily give "deference to the ALJ's assessments of witness credibility," when the ALJ erroneously rejects evidence in the record, it "call[s] into question more generally his conclusions regarding credibility"). Thus, we conclude that the ALJ's decision to entirely discount Ms. Madron's testimony about her back pain was not supported by substantial evidence.

## 2. *Respiratory Impairments*

The ALJ's conclusions regarding whether Ms. Madron's asthma renders her disabled find more support in the record. In discounting the credibility of Ms. Madron's assertions about the severity of her asthma, the ALJ indicated that: (1) record evidence did not support her allegation that she was often hoarse or had difficulty speaking as a result of her asthma; (2) record evidence did not show frequent respiratory infections and episodes of pneumonia; (3) continued smoking of cigarettes was inconsistent with the asserted inability to work due to a severe respiratory impairment; and (4) her pulmonary function showed significant improvement and was almost normal for a brief period when she ceased smoking. We conclude that substantial evidence supports the ALJ's decision to discount her testimony.

- 19 -

The record indicates that Ms. Madron has a life-long history of asthma. However, the record also suggests that she has attended an asthma management class and can control her symptoms through medication. Indeed, within a few months of beginning asthma management education, Ms. Madron reported feeling "120% better." Admin. R. at 194. At that point, she had not smoked for over two weeks and her lung function had returned from moderate restriction to within the normal range. The attending nurse indicated that the asthma self-management goals had been achieved and that Ms. Madron was "[a]ble to be as active as [she] desires—sleeps well, eats well, exercises, and able to maintain social contacts." *Id.* at 199.

Many of Ms. Madron's claims about the current severity of her asthma find no record support. The record does not support Ms. Madron's assertion that she continues to "get pneumonia four, five times a winter because of" her "real bad asthma." *Id.* at 34. Nor does the record contain any other indication of how her asthma currently would restrict her ability to work. On that basis, we conclude that the ALJ did not err in discounting her argument that her asthma was a disabling impairment.

Therefore, we need not resolve the complexities surrounding the extent to which the ALJ could rely on her continued smoking as additional grounds for his conclusion. *Compare Knipe v. Heckler*, 755 F.2d 141, 149 n.16 (10th Cir. 1985) (declining to accept the argument that a disability claim should be rejected for failure to take medications and refusal to quit smoking where the claimant had cut back smoking as a result of medical advice and asserted that he had stopped taking medications only because he lacked the

financial resources to purchase them), *and Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984) ("Smoking, like alcohol abuse, can be an involuntary act for some persons. . . . The Secretary may only deny the claimant benefits because of alcohol or tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking *and* the claimant is able voluntarily to stop."(emphasis added)), *with Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) ("Kisling's respiratory problems are related to her smoking habit. Although her physicians repeatedly recommended that she curb her smoking, Kisling did not heed this advice. Impairments that are controllable or amenable to treatment do not support a finding of disability . . . ."). In sum, we conclude that there is substantial support in the record for the ALJ's conclusion that Ms. Madron's asthma condition did not render her disabled.

### 3. Ankle Injury

Ms. Madron does not appear to challenge the ALJ's conclusion that her ankle fracture is not a disabling injury. A "disability" requires a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (quoting 42 U.S.C. § 423(d)(1)(A)); *see also* 42 U.S.C. § 1382c(a)(3)(A). The claimant has the burden to establish such an impairment. *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Ms. Madron has not alleged, nor identified record evidence which suggests, that (with or without surgery) this fracture cannot reasonably be expected

to resolve within that time. Therefore, we need not address the credibility of her pain from this injury, the credibility of her interest in recovery, or the credibility of her lack of financial resources for surgery. We note only that we do not find the ALJ's conclusions regarding the ankle injury relevant to Ms. Madron's credibility about her back pain or the affordability of the MRI discussed above.

### *4. Conclusion*

Without a proper assessment of Ms. Madron's credibility regarding her back pain and the limitations it causes, the ALJ had an inadequate basis to determine "whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." *Branum*, 385 F.3d at 1273 (quoting *Thompson*, 987 F.2d at 1488). Or, stated differently, the ALJ's resulting RFC assessment was not based on substantial evidence.

### B. Available Jobs

Separate and apart from disregarding Ms. Madron's testimony as to the severity of her back pain, the ALJ also erred in concluding that Ms. Madron was capable of returning to her previous work as a cashier II. That is, even if we were able to uphold the ALJ's RFC assessment, we would, nonetheless, be required to reverse his finding that Ms. Madron is not disabled at step four. The ALJ must determine whether the claimant is capable of performing any of her previous jobs, given her mental and physical limitations. The VE testified that Ms. Madron was capable of returning to her previous work as a cashier II. However, the job of cashier II requires a reading level of 2, and the ALJ specifically found that Ms. Madron only had a reading level of 1. *See* Dictionary of

Occupational Titles ("DOT") #211.462-010 (4th ed. 1991). The ALJ cannot simply rely on the testimony of the VE when that testimony conflicts with the DOT. "An ALJ [has] a duty to investigate and obtain a reasonable explanation for any conflict between the DOT and expert testimony before the ALJ may rely on the expert testimony as substantial evidence." *Hackett*, 475 F.3d at 1171. The VE did not offer, nor did the ALJ seek, any explanation for this apparent contradiction. Therefore, the ALJ's finding that Ms. Madron could work as a cashier II is not supported by substantial evidence. Moreover, the cashier II position was Ms. Madron's "only possibility" to return to her previous work. Admin. R. at 45.

The ALJ made the same mistake at step five of the analysis. At step five, the Commissioner had the burden of proving that Ms. Madron was capable of performing an alternate job that was available in the national economy. The VE identified two potential jobs that Ms. Madron might be able to perform: inspector/hand packager and small products assembler. However, the job of inspector/hand packager also requires a reading level of 2. *See* DOT #559.687-074. Once again, the VE failed to explain how Ms. Madron could be expected to perform this job despite her difficulty reading. This deficiency severely undercuts the ALJ's conclusion that Ms. Madron is not disabled.

### C. Remedy

"When a decision of the [Commissioner] is reversed on appeal, it is within this court's discretion to remand either for further administrative proceedings or for an immediate award of benefits." *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993).

- 23 -

In deciding on the appropriate remedy, we consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits.'" *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (alteration in original) (citation omitted) (quoting *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987)). In this case, we find that an immediate award of benefits is appropriate. It has been nearly six years since Ms. Madron first applied for supplemental security income and disability benefits. There is nothing to be gained from prolonging the proceedings any further. Even with the ALJ's erroneous RFC assessment, it is clear that Ms. Madron is incapable of performing any of her previous work. Moreover, the ALJ's conclusion that there are alternate jobs that she would be capable of performing is highly suspect, given his failure to appropriately account for her limited ability to read. Once a proper RFC assessment is done, giving due consideration to Ms. Madron's significant back pain, there is no reasonable probability that she would be denied benefits.

## III. CONCLUSION

Based upon the foregoing analysis, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to remand to the Commissioner for an immediate award of benefits as of December 15, 2002.

Entered for the Court

Jerome A. Holmes
Circuit Judge

- 24 -